**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-01893-CMA

MARALEX RESOURCES, INC., a Colorado corporation,
ALEXIS M. O'HARE, and
MARY C. O'HARE,

    Plaintiffs,

v.

SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior,
THE UNITED STATES DEPARTMENT OF THE INTERIOR, and
THE UNITED STATES OF AMERICA,

    Defendants.

**ORDER AFFIRMING AGENCY DETERMINATION**

This matter is before the Court for review of an agency action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* The Court has reviewed the Administrative Record (Doc. # 16), the Plaintiffs' opening brief (Doc. # 21), the Defendants' response brief (Doc. # 25), and the Plaintiffs' reply brief (Doc. # 28). The Court holds that the Interior Board of Land Appeals' finding that the Federal Oil and Gas Management Act authorizes Bureau of Land Management representatives to conduct warrantless, unannounced inspections of oil wells on Plaintiffs' fee lands was not arbitrary, capricious, or otherwise contrary to law. The Court declines to address

Plaintiffs' unpreserved argument that corrective action ordered by the BLM is not statutorily permissible.

## I. BACKGROUND AND PROCEDURAL HISTORY

On February 11, 2013, Gabriel Trujillo, a Bureau of Land Management ("BLM") technician, contacted Maralex Resources, Inc. ("Maralex") to announce his intention to inspect oil wells operated by Maralex. (AR at 105.) A Maralex employee told Mr. Trujillo the wells were on property belonging to Mickey O'Hare, and that she foresaw problems with obtaining access to the lease sites. (*Id.*) She directed Mr. Trujillo to contact Mr. O'Hare. (*Id.*) Mr. O'Hare told Mr. Trujillo that the BLM had "no rights to be on his land" to inspect the wells "because the surface and minerals were owned by him." (*Id.* at 44.)

After speaking with Mr. O'Hare, Mr. Trujillo and a BLM law enforcement officer attempted to inspect the wells, but were unable to do so because of a locked gate blocking access to the property. (*Id.* at 43–44.)

On February 26, 2013, the BLM issued four Notices of Incidents of Noncompliance ("INCs") to Maralex for refusing to permit inspection of the wells. (*Id.* at 13–21.) The INCs classified Maralex's violations as "minor" and did not assess any fines. (*Id.* at 14, 16, 18, 20.) As a corrective action, however, the INCs mandated that Maralex provide keys to the locked gates, or, alternatively, allow the BLM to place its own locks on the gates so that the BLM could access the wells. (*Id.* at 14–21.)

On August 13, 2013, six months after Mr. Trujillo attempted to inspect the wells, Mr. O'Hare met a BLM inspector at the gate to his property and "allowed [him] to enter and inspect the wells and facilities." (*Id.* at 108.)

Maralex eventually appealed the INCs to the Interior Board of Land Appeals ("IBLA"), thereby exhausting its administrative remedies. On July 10, 2015, the IBLA upheld the INCs. (*Id.* at 469.)

### A. The Communitization Agreement

The oil wells in dispute are subject to a Communitization Agreement ("CA"). (*Id.* at 26.) The parties to the CA include, among others, lessee Maralex, of which Mr. O'Hare is the President, and the Southern Ute Indian Tribe ("the Tribe"). (*Id.* at 38–40.) The CA states that "[t]he Communitized Area shall be developed and operated as an entirety, with the understanding and agreement between the parties hereto that all Communitized Substances produced therefrom shall be allocated among the leaseholds comprising said area in the proportion that the acreage interest of each leasehold bears to the entire acreage interest committed to this agreement." (*Id.* at 28.)

The parties recognized that their mineral interests "under the leases and lands subject to this agreement . . . cannot be independently developed and operated." (*Id.* at 27.) They agreed to "communitize and pool their respective mineral interests in lands subject to this agreement for the purpose of developing and producing communitized substances." (*Id.* at 27.) The interests committed to the CA are treated as a single entity. (*Id.* at 28, 41.) The oil production is proportionally allocated among the parties based on the number of acres they each committed to the agreement. (*Id.*)

**B. The Federal Oil and Gas Royalty Management Act**

Congress enacted the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. §§ 1701 *et seq.* ("FOGRMA"), to improve the royalty payments accounting system from oil and gas leases on federal and Indian lands. *See* 30 U.S.C. § 1701; H.R. Rep. No. 97-859 at 15–19 (1982). It also authorizes the Secretary of Interior to conduct "any investigation or other inquiry necessary and appropriate" to carry out his or her duties under FOGRMA. 30 U.S.C. § 1717.

FOGRMA includes guidance regarding the inspection of lease sites and the right of the Secretary to travel across sites. *Id.* § 1718. Pertinent provisions provide:

> Authorized and properly identified representatives of the Secretary may without advance notice, enter upon, travel across and inspect lease sites on Federal or Indian lands and may obtain from the operator immediate access to secured facilities on such lease sites, for the purpose of making any inspection or investigation for determining whether there is compliance with the requirements of the mineral leasing laws and this chapter. The Secretary shall develop guidelines setting forth the coverage and the frequency of such inspections. *Id.* § 1718(b).

> For the purpose of making any inspection or investigation under this chapter, the Secretary shall have the same right to enter upon or travel across any lease site as the lessee or operator has acquired by purchase, condemnation, or otherwise. *Id.* § 1718(c).

Congress further directed the Secretary to "establish procedures to ensure that authorized and properly identified representatives of the Secretary will inspect at least once annually each lease site producing or expected to produce significant quantities of oil or gas. . . ." *Id.* § 1711(b)(1). It permitted the Secretary to "prescribe such rules and regulations as he deems reasonably necessary" to carry out the Act. *Id.* § 1751(a).

### III. JURISDICTION AND VENUE

Plaintiffs seek judicial review of the IBLA's decision to uphold the BLM's INCs. (Doc. # 21.)  Pursuant to 43 C.F.R. §§ 4.1(b)(3) and 4.21(c), the IBLA's decision constitutes a final agency action for purposes of judicial review under the Administrative Procedure Act, 5 U.S.C. § 704 ("APA").  Although the APA itself "does not afford an implied grant of subject-matter jurisdiction" to review federal administrative action, this Court can exercise federal question jurisdiction to review administrative action under 28 U.S.C. § 1331.  See *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Plaintiffs also claim the BLM actions in question are facially unconstitutional and unconstitutional as applied because they violate Mr. O'Hare's Fourth Amendment right to be free from unreasonable searches and seizures, and constitute a regulatory taking of his property.  (Doc. # 1.)

This Court, therefore, has jurisdiction over this matter pursuant to 5 U.S.C. § 704, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (a)(3) (deprivation of constitutional rights), and 28 U.S.C § 1346 (United States as defendant).  Venue is proper pursuant to 28 U.S.C. § 1391(e) because the events giving rise to the claims took place in this district.

### IV. STANDARD OF REVIEW

The question presented by this administrative appeal is whether the IBLA's decision upholding the INCs was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  (Doc. ## 1, 25; *see also* 5 U.S.C. § 706(2)(A).)

"The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The focus is on the rationality of the decision-making process, not on the wisdom of the decision itself.  *Olenhouse*, 42 F.3d at 1575.  The Supreme Court instructs:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle*, 463 U.S. at 43.

When a court is applying the arbitrary and capricious standard to ensure factual support for an agency's decision, the inquiry is equivalent to the "substantial evidence" standard.  *Olenhouse,* 42 F.3d at 1575–76 (quoting *Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677, 684 (D.C. Cir. 1984)).  In this context, evidence is "substantial" if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Illinois Cent. R.R. Co. v. Norfolk & Western Ry.*, 385 U.S. 57, 66 (1966).  "This is something more than a mere scintilla but something less than the weight of the evidence." *Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir. 1991).

The IBLA did not rule on Plaintiffs' constitutional arguments.  (AR at 486.)

Accordingly, the Court will review *de novo* the question of whether the IBLA's decision upholding the INCs violated Plaintiffs' constitutional rights. *See, e.g., Copar Pumice Co., v. Tidwell*, 603 F.3d 780, 802 (10th Cir. 2010).

## **V. ANALYSIS**

Plaintiffs appeal the IBLA's July 10, 2015 decision to uphold the BLM's INCs. Specifically, Plaintiffs argue that:

(1) Neither 30 U.S.C. § 1718 nor 43 C.F.R. 3162.1(b) authorizes BLM representatives to conduct warrantless, unannounced inspections of oil and gas facilities located on fee lands;

(2) Even if the BLM is authorized to conduct warrantless inspections, 30 U.S.C. § 1718, or any applicable regulation, does not mandate the landowner to provide the BLM with keys to the landowner's locked gates or to allow the BLM to place its own locks on the landowner's locked gates; and

(3) If 30 U.S.C. § 1718 and/or 43 C.F.R. 3162.1(b) indeed authorize the BLM to conduct warrantless, unannounced inspections of oil and gas facilities located on fee lands, the statutes and/or regulations are facially unconstitutional, and unconstitutional as applied, because they: (a) violate the landowner's Fourth Amendment rights to be free from unreasonable searches and seizures and (b) constitute an impermissible taking of the landowner's property rights.

The Court will address each argument in turn.

### 1) FOGRMA grants BLM representatives the authority to conduct warrantless, unannounced inspections.

Plaintiffs argue FOGRMA, 30 U.S.C. § 1701, *et seq.*, and specifically, 30 U.S.C. § 1718, does not authorize the BLM representatives warrantless, unannounced access to inspect oil and gas well facilities located on fee lands subject to a communitization agreement. The Court disagrees.

In reviewing an agency's interpretation of a statute it administers—here, FOGRMA—the Court first determines "whether Congress has directly spoken to the precise question at issue." *Am. Colloid Co. v. Babbitt*, 145 F.3d 1152, 1154 (10th Cir. 1998) (internal quotation omitted). If "the particular statutory language at issue, as well as the language and design of the statute as a whole," suggests Congress has directly spoken on the precise question at issue, then the Court "must give effect to the unambiguously expressed intent of Congress." *Id.* (internal quotation omitted). If, however, "the statute is silent or ambiguous with respect to the specific issue, the Court considers whether the agency's answer is based on a permissible construction of the statute, that is, whether the agency's construction is rational and consistent with the statute." *Id.* at 1155 (internal quotation omitted); *see also Jicarilla Apache Nation v. United States Dep't of the Interior*, 892 F. Supp. 2d 285, 292 (D.D.C. 2012) ("Deference to Interior's interpretation . . . under FOGRMA and Parts 241 [referring to regulations governing notices of non-compliance] is appropriate because Congress expressly delegated authority to the Department to issue rules and regulations to administer FOGRMA.").

Further, a court's review of "an agency's interpretation of its own regulations is

8

substantially deferential." *Copar*, 603 F.3d at 794.  Courts give "the agency's interpretation 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"  *Id.* (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Additionally, courts construe statutes "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Mont. v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (interpreting the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396a *et seq.*).

In the instant case, the IBLA found that the BLM had authority under FOGRMA to inspect wells (the Katie Eileen Wells) subject to the CA.  (AR at 470–71, 478–79.)  The IBLA concluded that nothing in FOGRMA "precludes BLM . . . from inspecting non-Federal/non-Indian lease sites, for the purpose of determining whether oil or gas production from non-Federal/non-Indian lands is being accurately recorded and reported . . . when that production is properly attributable to Federal or Indian lands, under . . . communitization agreements."  (AR at 478.)  The IBLA reasoned that one purpose of FOGRMA is "'to require the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues owed to . . . Indian lessors[.]'"  30 U.S.C. § 1701(b)(3).  (*Id.* (quoting same).)

Plaintiffs, however, contend that "[t]he only inspections the Secretary is authorized to conduct under FOGRMA are limited to 'lease sites on Federal or Indian lands' as set forth in Section 1718(b)."  (Doc. # 21 at 12.)

Although the specific inspection directive in 30 U.S.C. § 1718(b) refers only to "lease sites on Federal or Indian lands," production from any lease site subject to a

9

communitization agreement (whether on fee or Indian land) is deemed to occur on each lease site within the communitization agreement.  *See Cheyenne-Arapaho Tribes of Okla. v. United States*, 966 F.2d 583, 585 (10th Cir. 1992).  As the IBLA found, FOGRMA requires the development of procedures to ensure proper collection and disbursement of oil and gas revenues owed to Indian lessors from oil and gas both originating from, and allocated to, Indian lands.  (*See* AR at 478 (citing 30 U.S.C. § 1701(b)(3); *id.* § 1702(9)).)

Here, production from the Katie Eileen Wells, leased by the O'Hares to Maralex, is allocated to the Tribe's lease, and a proportional share of royalties generated from that communitized production are owed to the Tribe.  (AR at 478.)  Therefore, the IBLA reasonably concluded that the governing regulations require operators of lease sites—without distinguishing between lease sites on Indian lands and fee lands subject to a communitization agreement—to permit inspection.  (*Id.* at 480 (quoting 43 C.F.R. § 3162.1(b)).)

Further, the "right of supervision" to which Maralex agreed under the CA does not mention advance notice.  (*Id.* at 30.)  On the other hand, the guiding regulation expressly requires Maralex to allow "properly identified representatives of the Secretary" to conduct inspections "without advance notice."  30 U.S.C. § 1718(b).

The IBLA's interpretation is controlling unless it is plainly erroneous or inconsistent with the regulations.  *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1425, 1441–42 (9th Cir. 1990).  The IBLA's reasoning here, supported with the administrative

record, is not inconsistent with the governing regulations.  The BLM, therefore, had the authority to inspect these wells without a search warrant or advance notice.

**2) Plaintiffs waived their argument that requiring Maralex to provide the BLM with keys to its locked gates, or allowing the BLM to place its own locks, is not a statutorily permissible corrective action.**

Although FOGRMA provides for civil penalties for failure to take "corrective action," 30 U.S.C. § 1719(b)-(c), it does not define "corrective action."  The closest the regulations come to addressing the scope of corrective action is that, "[w]hen necessary for compliance, the authorized officer may enter upon a lease and perform, or have performed, at the sole risk and expense of the operator, operations that the operator fails to perform when directed in writing by the authorized officer."  43 C.F.R. § 3163.1(a)(4).

As corrective action in the instant case, the INCs required Maralex to provide keys to the locked gates so that authorized BLM representative could access the wells, or, alternatively, to place the BLM's own locks on the gates.  (AR at 14–21; Doc. # 21 at 2.)

Plaintiffs argue that 30 U.S.C. § 1718, or any applicable regulation, does not authorize the BLM to demand that the operator and the landowner give keys to the landowner's locked gates or to place its own locks.  (Doc. # 21 at 20.)  They claim that it only requires "immediate access," "without advanced notice," and that this access is limited to "authorized" and "properly identified" personnel.  (*Id.* at 19–20 (quoting 30 U.S.C. § 1718).)

Plaintiffs, however, did not present to the IBLA this particular argument that the

11

BLM's corrective action exceeded its authority.  "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see also Wilson v. Hodel*, 758 F.2d 1369, 1372–73 (10th Cir. 1985).  Absent "exceptional" or "particular circumstances" where "injustice might otherwise result," *Hormel v. Helvering*, 312 U.S. 552, 557 (1941), a reviewing court will not consider arguments "which were not pressed upon the administrative agency," *Hodel*, 758 F.2d at 1373.  Plaintiffs have not argued to the Court, nor does the Court perceive, any such exceptional or particular circumstances that might relieve them of their obligation to raise this argument before the IBLA.  The Court therefore finds that Plaintiffs waived this argument for purposes of this appeal and declines to consider it.

**3) The BLM's access does not violate O'Hares' right to be free from unreasonable searches and seizure, as guaranteed by the Fourth Amendment.**

Plaintiffs argue that allowing the BLM to access the O'Hares' fee lands at any time, and without any limitation or search warrant, violates the O'Hares' rights to be free from unreasonable searches and seizures rights.  (Doc. # 21 at 18.)

Plaintiffs conflate the inspection limits in 30 U.S.C. § 1718(b) with the corrective action set forth in the INCs.  As long as the BLM's inspection does not exceed the scope outlined in the CA and applicable regulations, providing the BLM with keys to the O'Hares' locked gates, or placing the BLM's own locks on O'Hares' gates, does not

12

violate Plaintiffs' Fourth Amendment rights.

In leasing their interests to Maralex, the O'Hares gave Maralex the right to enter their property as reasonably necessary to develop the mineral estate. *See Entek GRB, LLC v. Stull Ranches, LLC*, 885 F. Supp. 2d 1082, 1088 (D. Colo. 2012). Maralex, in turn, committed this lease to the CA. (AR at 26–29.) It agreed to the BLM's supervision over all operations subject to the agreement, including those on the O'Hares' lands. (*Id.* at 30.) The BLM, by statute and regulation, has the same right to enter the land as Maralex, the lease owner. *See* 30 U.S.C. § 1718(c).

The IBLA recognized that the BLM's authority to inspect wells on the O'Hares' land subject to the CA was limited to "'site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements.'" (AR at 479 (quoting 43 C.F.R. § 3161.1(b)).) There is no evidence that the BLM ever sought, or was granted, access to the O'Hares' property for any purpose other than to conduct these limited inspections.

Further, the record does not show the BLM seeks, or has been granted by the IBLA, the authority to inspect the Katie Eileen Wells other than in accordance with the regulations. The regulations expressly state that "[i]nspections normally will be conducted during those hours when responsible persons are expected to be present at the operation being inspected." 43 C.F.R. § 3162.1(b).

Moreover, a party can contract away its privacy rights. *See, e.g., Zap v. United States*, 328 U.S. 624, 628 (1946) (holding that contractor who, in order to obtain government business, agreed by contract to permit inspection of his accounts and

records during business hours, waived any rights to privacy he might otherwise have had with respect to business documents related to the government contract), *vacated on other grounds*, 330 U.S. 800 (1947); *see also Copar Pumice Co. v. Morris*, 632 F. Supp. 2d 1055, 1079-80 (D.N.M. 2008).  Maralex agreed that the BLM shall have the right of supervision over all operations within the CA under which the Tribe is lessor, insofar as governed by applicable regulations.  (AR at 30; Doc. # 21 at 13.)

Therefore, assuming that the corrective action is permissible, as long as the BLM's inspection—after obtaining keys or placing its own locks—is limited to the conditions imposed by the CA and applicable regulations, including 43 C.F.R. § 3161.1(b) and 43 C.F.R. § 3162.1(b), such access does not violate the O'Hares' right to be free from unreasonable searches and seizure.

### 4) The BLM's authority to conduct searches does not constitute a physical taking of Plaintiffs' property.

Plaintiffs argue that if they are forced to turn over keys to the BLM, or to allow the BLM to install its own locks, they will be unable to exclude unauthorized or unidentified persons from accessing the wells on their property.  (Doc # 1 at 2.)  They suggest this constitutes a regulatory taking of their property.  (Doc ## 1 at 2, 21 at 23–24.)

In order to establish a regulatory taking claim, Plaintiffs need to show "a permanent physical invasion of private property," deprivation of "all economically beneficial use of the property," or a taking based on the "magnitude of the economic impact . . . and the extent of the regulation's interference with property rights."  *Alto Eldorado P'ship v. Cty. of Santa Fe*, 634 F.3d 1170, 1173-74 (10th Cir. 2011) (internal citations omitted).  Plaintiffs claim the corrective action set forth in the INCs would

"eviscerate" their right to exclude others. However, they cite no other authority in support of their argument that the limited access upheld by the IBLA would constitute a taking. The Court cannot support a Fifth Amendment challenge that is unsupported by fact or law.

Further, Plaintiffs' claim regarding regulatory taking is not ripe. They have not sought any compensation for the alleged taking. *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985) (noting that "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act").

## VI. CONCLUSION

The Court holds that the IBLA's finding that FOGRMA grants the BLM representatives warrantless, unannounced authority to inspect the wells on Plaintiffs' fee lands was not arbitrary, capricious, or otherwise contrary to law.

Further, as long as the scope of the BLM's inspection does not exceed the conditions outlined in the CA and applicable regulations, the BLM's access to the O'Hares' fee lands without notice or a search warrant does not violate their right to be free from unreasonable searches and seizure, as guaranteed by the Fourth Amendment.

The Court declines to consider if requiring Plaintiffs to provide the BLM with keys, or allowing the BLM to place its own locks on the O'Hares' gates, falls within the statutorily permitted corrective action because Plaintiffs waived this argument before the IBLA.

DATED: October 19, 2017

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge